OPINION OF THE COURT
John B. Riordan, J.
Submitted for decision is the issue of estate tax apportionment in the estate of Gertrude Feil but governed by the terms of the will of her predeceased husband, Louis Feil. The issue arises from the interaction of several factors: (1) an apportionment clause in Louis’s will that varies EPTL 2-1.8 by requiring estate taxes be paid from the residuary estate; (2) intraresiduary bequests in Louis’s will to both charitable and noncharitable beneficiaries; and (3) the nature of charitable bequests and their favored status vis-a-vis tax apportionment. One might also include a fourth issue — the complications that arise when the dispute arises in one spouse’s estate but the bequests are governed by the testamentary plan of her predeceased spouse. For the reasons that follow, it should become clear that on these facts the “pass through” issue is moot.
Louis Feil died a resident of Nassau County on February 3, 1999. His will, dated November 5, 1996, was admitted to probate by this court on June 10, 1999. Mr. Feil was survived by his wife, Gertrude, and by their four adult children: Marilyn, Judith, Carole, and Jeffrey. Carole and Jeffrey are the coexecutors of Louis’s estate as well as the cotrustees of the trusts established by Louis’s will. Carole is the petitioner and Jeffrey is the respondent in this proceeding to determine the proper way to apportion estate taxes.
The dispute arose when Gertrude Feil died on January 4, 2006, and her will was admitted to probate by this court. Although Gertrude’s death triggered the estate tax apportionment dispute, the issue originates and remains in the testamentary *276 plan of Louis, whose estate passed free of estate taxation.[1] Because Louis predeceased Gertrude, his entire estate of approximately $250,000,000 passed through the residuary clause in his will. The residuary clause created a marital trust for the benefit of Gertrude and upon her death gave the remainder to two classes of continuing trusts, one set of continuing trusts for the benefit of issue and one set of charitable lead annuity trusts (CLATs). The two coexecutors of Louis made a qualified terminable interest property (QTIP) election on the federal estate tax return and the marital trust was fully funded with the $250,000,000, all of which was free of estate taxes in the estate of Louis. However, the QTIP election merely deferred the estate tax until the death of the surviving spouse because the Internal Revenue Code considers a marriage to be a single economic unit. In this regard, the QTIP marital trust provides a temporary safe harbor from the immediate application of the terminable interest rule (cf. Internal Revenue Code [26 USC] § 2056 [b] and [b] [7]) that would otherwise prevent a marital deduction for bequests to a spouse in trust that do not also give the surviving spouse a general power of appointment over the remainder.
For the purposes of this decision, the following provisions in the will of Louis Feil are relevant:
“FOURTH: DOLLAR AMOUNT LEGACIES TO INDIVIDUALS.
“If Gertrude dies before I do, I give Twenty Million Dollars ($20,000,000) to my issue, subject to the Continuing Trust provisions of Article SEVENTH . . .
“FIFTH: RESIDUARY ESTATE.
“A. GERTRUDE SURVIVES. If Gertrude is living, I give my Residuary Estate to my Trustees, IN TRUST, as follows:
“NAME OF THE TRUST
“The trust shall be known as the ‘Marital Trust’
“FINAL DISTRIBUTION
*277 “When the Marital Trust ends [upon Gertrude’s death], my Trustees shall pay the trust fund as follows:
“1. An amount equal to Twenty Million Dollars ($20,000,000) to my issue, subject to the Continuing Trust provisions of Article SEVENTH; and
“2. The balance to the Trustees of the Charitable Lead Annuity Trusts established under Article SIXTH.
“B. GERTRUDE PREDECEASES. If Gertrude dies before I do, I give my Residuary Estate to the Trustees of the Charitable Lead Annuity Trusts established under Article SIXTH . . .
“SIXTH: CHARITABLE LEAD ANNUITY TRUSTS...
“CHARITABLE DISTRIBUTIONS
“My Trustees shall pay the annuity amount to such one or more Qualified Charities as my Trustees shall select... in each taxable year of the trust until the expiration of the Trust Term. The annuity amount is the smallest amount that could be provided under the terms of the trust to produce a Federal estate tax deduction in my estate equal to one hundred percent (100%) of the Federal estate tax value of the assets constituting the trust. . .
“TWELFTH: DEATH TAXES.
“A. IN GENERAL. I direct that my Death Taxes with respect to property passing under this Will and property passing under any trust or trusts included in my gross estate under Section 2044 of the Code (i) with respect to which an election under Section 2652 (a) (3) of the Code has been made and (ii) that is for the primary benefit of one or more of my issue, shall be charged, without apportionment, entirely against my Residuary Estate.”
If Gertrude predeceased Louis, a preresiduary specific bequest of $20,000,000 would pass to the continuing trusts of article seventh for the benefit of the issue of Louis Feil. That bequest would pass free from estate taxation because article twelfth requires nonapportionment, thereby requiring taxes to be paid from the residuary estate which was the sole remaining beneficiary of the will. If Gertrude survived Louis, as she did, then the entire estate passed to Gertrude in the residuary estate, albeit in a marital trust subject to a QTIP election. However, *278 even in the event that Gertrude survived Louis, the $20,000,000 bequest to the continuing trusts from article fourth for the benefit of issue does not disappear. Instead, it survives in the residuary clause, lurking inchoate in the marital trust as one of two classes of remainder beneficiaries of the marital trust when Gertrude died. The other class of remainder beneficiaries upon the termination of the marital trust is the series of charitable lead annuity trusts, or CLATs.
Carole Feil (as coexecutor and cotrustee) takes the position that the $20,000,000 bequest to the continuing trusts retains its tax-favored position regardless of either its status as a preresiduary bequest (if Gertrude predeceased Louis) or as the remainder of the marital trust (if Gertrude survived Louis).
Jeffrey Feil (also as coexecutor and cotrustee) disagrees with his sister and takes the position that as the noncharitable portion of the residuary estate of Louis Feil, it must bear the burden of the estate taxation that came due on remainder of the marital trust when Gertrude died.
For the reasons that follow, the court finds Carole’s position as the correct construction of the intent of Louis Feil.
There are two related rules of testamentary construction that have been developed over the years: one, that a will must be interpreted to reflect the actual intention of the testator; and two, that this intention be ascertained from a sympathetic reading of the document as a whole. (See e.g. Matter of Bieley, 91 NY2d 520 [1998]; Matter of Dammann, 12 NY2d 500, 504-505 [1963]; Matter of Fabbri, 2 NY2d 236, 240 [1957]; Williams v Jones, 166 NY 522, 532-533 [1901].) If a “general scheme” can be found within the four corners of the document itself, then it is the duty of the courts to carry out the testator’s purpose, notwithstanding that “general rules of interpretation” might point to a different result (Williams v Jones, 166 NY 522, 533 [1901]). If this process were as simple as described, there would be no occasion for the many cases illustrating these principles. Because each will is a unique document there is a corollary to these broad principles. A court may “give effect to an intention or purpose, indicated by implication, where the express language of the entire will manifests such an intention or purpose” and the testator has simply neglected to provide for the exact contingency which occurred or thought that he or she had made such intention clear in the context (Matter of Seiner, 261 App Div 618, 620 [2d Dept 1941], affd 287 NY 664 [1941]; see also Matter of Gulbenkian, 9 NY2d 363, 370 [1961]). Hence, “[i]ntent *279 is not to be gleaned by focusing upon any one particular word, sentence or provision; rather, it must be ascertained from a perusal of the entire will by a reader mindful of the particular facts and circumstances under which the provisions of the instrument were framed” (Matter of Bellows, 103 AD2d 594, 597 [2d Dept 1984]). Added on to this common-law edifice is the strong policy in favor of statutory apportionment and the requirement that those who would seek to stray from such policy must produce a clear and unambiguous direction to the contrary in the will (Matter of Mann, 186 AD2d 500 [1st Dept 1992]).
The issue of estate tax apportionment is an issue that is governed by the intent of Louis Feil and based upon a fair reading of his will as a whole it is clear to the court that he intended the $20,000,000 to survive intact both his death and his wife’s death.
EPTL 2-1.8 governs issues related to the apportionment of estate taxes. It is a default statute and provides that unless the testator has expressed an intent to the contrary, the estate tax is to be paid by all beneficiaries according to their interest in the gross tax estate — unless the beneficiary is a qualified charity. The deduction that the estate receives for charitable gifts must benefit the charity and therefore the charity is generally not liable for tax on the amount it receives. Therefore, charitable dispositions are “not taxable and in consequence may not be burdened with any part of the estate tax deficit” (Matter of Volckening, 70 Misc 2d 129, 133 [Sur Ct, Kings County 1972]; see EPTL 2-1.8 [c]). These rules do not apply if the testator directs otherwise in his or her will. Moreover, construction proceedings of unique instruments are sui generis and rules of interpretation are subordinated to the requirement that the actual intent of the testator be sought and given effect (Matter of Fabbri, 2 NY2d 236 [1957]).
Before proceeding with the analysis, it might be instructive to highlight the effect of a decision either way and to describe the purpose of charitable lead annuity trusts. As to the stakes involved here, the figures used are approximate and meant for purposes of illustration only.
[[Image here]]
It is readily apparent that Carole’s interpretation preserving the “full value” of the continuing trusts results in more money *280 going to the Internal Revenue Service (IRS) than does the interpretation favored by Jeffrey. The court notes, however, that any rules of construction that generally favor tax savings must still give way to the intent of the testator. In some respects, one could conclude that the difference between Carole and Jeffrey is between short-term gain (Carole) for the continuing trusts and the potential for long-term gain (Jeffrey) because the continuing trusts for the benefit of issue are also the remainder beneficiaries when the CLATs terminate. Of course, the court notes the possibility that the remainder of the CLATs may be zero, after all they are not called “zeroed-out charitable lead annuity trusts” without reason. At this juncture, it might be useful to expand on these concepts and to explain how properly structured annuity payments of a CLAT can result in zero tax exposure at inception and tax-free distributions of a remainder at the termination of the trust.
A CLAT is a split-interest trust that pays an annuity to a charity for the life of some person or for a term of years, with the remainder interest payable to a noncharitable beneficiary (typically, the testator’s family). Both the charitable lead portion and the remainder portion can be readily calculated. The charity receives annual payments from the CLAT for a period of time and what is remaining in the CLAT at the end of the term belongs to the decedent’s family outright or through a device like the continuing trusts here and passes to them with no further tax consequences because all estate tax consequences are fixed at the time the CLAT is created. The decedent receives an estate tax charitable deduction for the present value of the lead interest while the present value of the remainder interest is includible in the gross estate. It is therefore possible to set the value of the lead interest equal to the full value of the property transferred to the CLAT, making the value of the remainder interest zero. These are in effect estate freeze techniques that capitalize on the mismatch between the “locked-in” interest rates used to value transfers by the IRS and the actual anticipated performance of the transferred assets. If the assets can be managed to produce a rate of appreciation that exceeds the “locked-in” rate applied by the IRS, then the appreciated sum will pass tax-free to the remainder beneficiaries. This is the reason a CLAT is a valuable estate planning tool in a low-interest-rate environment. CLATs are particularly suited for hard-to-value assets (such as real estate) and assets which are expected to grow rapidly in value.
*281 Based on the foregoing, it is clear that the charitable lead annuity trust is an estate freeze plan for large estates (see Whitty, Effects of Low Interest Rates on Investment-Driven Estate Planning Techniques, 30 Est Plan 587 [Dec. 2003]; Freeman Rapkin, Planning for Large Estates [Matthew Bender & Co., Inc. 2007]). The intent behind a “zeroed-out charitable lead annuity trust” like these is to maximize a charitable deduction so as to produce a tax-neutral event because the present value of the lead charitable portion of the trust cancels out the presumptive remainder value of said trust. But this is an actuarial estimation. It preserves the possibility that there will be an actual remainder to pass on tax-free. The value of the lead interest is set at the date of Gertrude’s death using the percentages set under Internal Revenue Code § 7520. In a low-interest environment, a relatively low Internal Revenue Code § 7520 rate coupled with a favorable (i.e., low) valuation of the assets funding the CLAT means that the actual remainder of the Feil CLATs will exceed the initially presumed remainder and would pass tax-free to the continuing trusts. Of course, it is also possible that the rate of return on the trust assets does not exceed the Internal Revenue Code § 7520 rate and that the assets were initially fully or even overly valued. This would make the CLAT a sinking fund resulting in an actual remainder of zero. The court also notes that we are currently in a low-interest-rate environment, thereby enhancing the viability of these CLATs. However, whatever long-term possibilities exist with regard to these CLATs, those possibilities cannot defeat the intent of Louis Feil.[2] Therefore, while one cannot minimize the charitable intent possessed by Louis Feil in granting such a large sum to a trust for undesignated charities, it must also be recognized there are significant planning advantages behind the charitable intent.
The intent of Louis Feil is established clearly and unambiguously in his will by the entirety of the circumstances — the use of a fixed sum in funding the continuing trusts, i.e., $20,000,000, and the repeated use of that fixed sum both inside and outside the residuary as the intended amount should Louis have died before or after Gertrude, and the corresponding lack of logic that results in reading Louis’s use of the pronoun “my” in his will in a narrow way to apply only to his estate taxation. To come to the conclusion advanced by Jeffrey would require the *282 court to find that Louis intended $20,000,000 to pass tax-free to the continuing trusts if Gertrude died before he did but not if he died first. This strikes the court as most unlikely and not supported by the language chosen by Louis to make these decisions. After all, and as pointed out above, there exists a nontrivial chance that there may be no remainder to the CLATs at all. This is not a case where the issue of Louis and the charities were to each receive a fractional share of the residue. Instead, Louis made a specific bequest of a fixed dollar amount to continuing trusts for his issue with the “balance” (in the words of Louis’s will) going to the CLATs, or as Louis expressed it, “pay . . . [a]n amount equal to Twenty Million Dollars ($20,000,000)” to the continuing trusts. It is this intent that precludes the application of Internal Revenue Code § 2207A[3] as argued by the Attorney General. Likewise, Jeffrey’s reliance on Matter of Shubert (10 NY2d 461 [1962]) is similarly unpersuasive. Shubert did not involve a specific bequest operative both outside the residuary estate (if Gertrude predeceased) or inside the residuary (if Gertrude survived Louis). Moreover, and in contrast to Louis’s will, which clearly specified that taxes are to be charged “without apportionment,” the tax clauses in Shubert did not contain any directions about apportionment of the taxes, merely directing taxes to be paid from the residue. The court agrees with Carole and her assessment that Matter of Kindermann (21 NY2d 790 [1968]) is more analogous to these facts than is Matter of McKinney (101 AD2d 477 [2d Dept 1984]). In sum, to accept Jeffrey’s argument is to accept an intent on the part of Louis that conceivably would result in none of a $250,000,000 estate going to his issue but being instead used to produce a double-tax-free estate. It is possible that Louis Feil disliked the IRS more than he loved his children, but that result does not seem likely under the circumstances presented.
Finally, Carole’s reliance on “true residuary” jurisprudence is appropriate and the court considers it to be an extension of her other arguments. In this line of cases, the distinguishing factor *283 in determining when courts should parse a residuary clause for apportionment purposes is when there is a bequest of a specific dollar amount contained within a portion of the will which is ostensibly the residuary clause. Where a residuary distribution is divided between fractional or percentage shares (see Matter of McKinney, 101 AD2d 477 [2d Dept 1984]), courts typically conclude that intraresiduary apportionment applied and that, absent an unequivocal exoneration from statutory apportionment within the residue, all residuary beneficiaries bear the taxes attributable to their share of the residue, and all exempt beneficiaries are entitled to the benefit of the charitable (or marital for that matter) deduction. Therefore, the noncharitable portion of the residuary assumes the full burden. However, when a residuary distribution is divided between specific dollar amounts and a further distribution of the “balance” or the “amount remaining” (see Matter of Kindermann, 21 NY2d 790 [1968]), then the specific bequests are exonerated from paying any portion of the estate taxes, and the estate taxes are charged entirely against the “true residuary,” even if the true residuary is charitable.
In conclusion, Carole’s construction of the will is the correct one. Her petition is granted.

. EPTL 2-1.8 (a) gave Louis the right to control how the estate taxes with respect to his property are allocated among the recipients of the property, regardless of when such taxes are payable. EPTL 2-1.8 (d) gave Gertrude the limited power to exonerate the marital trust from any tax burden and to use her own separate property to pay all the taxes due. This was not done. Gertrude did not have the power to determine how taxes that were left to be paid from the trust would be apportioned among the trust beneficiaries; only Louis could do that.

. The court further notes that the IRS applied a section 7520 rate of 5.4% to the Feil CLATs. The current section 7520 rate is 3.2%.

. Internal Revenue Code § 2207A requires specific direction by the surviving spouse to reallocate the taxes from the beneficiaries of the QTIP property. The issue here is the intent of Louis, as expressed in his will, not the intent of Gertrude. It is true that Gertrude could have used her own separate property to free the marital trust property from bearing all or part of the trust tax burden at her death. (See EPTL 2-1.8 [d].) However, she did not have the power to determine how taxes that were left to be paid from the marital trust would be allocated among the trust beneficiaries; only Louis could do that. To have it otherwise would possibly defeat the purpose of the QTIP altogether.